ANDREW EARL KARSH
1931 Vereda Court
El Cajon, CA 92010
Tel: (619) 874-9273
Fax: (619) 874-1121
Email: karsh.andrew@gmail.com

ANDREW EARL KARSH
Plaintiff, In Propria Persona



FILED

MAY 11 2016

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ Th _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW EARL KARSH,, <br><br> Plaintiff, <br><br> vs. <br><br> BANK OF AMERICA, N.A.; COUNTRYWIDE HOME LOANS, INC; DEUTSCHE BANK, AG, DEUTSCHE BANK NATIONAL TRUST CO., DEUTSCHE BANK; TRUST CO; FIDELITY NATIONAL FINANCIAL, INC.; MORTGAGE ELECTRONIC REGISTRATION SERVICES (MERS); FIDELITY NATIONAL FINANCIAL, INC.; SPECIALTY PORTFOLIO SERVICES, INC; DOE ENTITIES 1 THROUGH 10, INCLUSIVE, <br><br> Defendants. | SDDC No: '16 CV 1 1 2 9 MMA BGS <br><br> **VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF AND MONETARY DAMAGES;** <br><br> **VIOLATIONS OF THE RICO ACT [RACKETEER INFLUENCE AND CURRUPT ORGANIZATIONS] RICO 18 U.S..C. SECTION 1962(C)** <br><br> **RICO CASE STATEMENT;** <br><br> **VERIFICATION OF COMPLAINT;** <br><br> **[DEMAND FOR JURY TRIAL]** <br><br> **CIVIL SUMONS** <br><br> (Injunctive Relief/RICO) |

Plaintiff, ANDREW EARL KARSH , ("Plaintiff") hereby brings his Verified

Complaint in this action against Defendants above-stated for the following causes of

action: FRAUDULENT FORECLOSURE, RACKETERING INDUSTRISES AND

CURRUPT ORGANIZATIONS (RICO); QUIET TITLE; SLANDER OF TITLE;

CANCELLATION OF INSTRUMENTS; PROMISORY ESTOPPEL; NEGLIGENCE;

NEGLIGENT REPRESENTATION; FRAUD-IN-THE-EXECUTION; VIOLATION OF THE

FAIR DEBT COLLECTIONS PRACTICES ACT, VIOLATION OF UNFAIR

COMPETITION LAW (UCL) BUSINESS & PROFESSIONS CODE (SECTION 17200)

UNFAIR BUSINESS PRACTICES; DECLARATORY JUDGEMENT;  AND INJUNCTIVE

RELIEF, pursuant to the Homeowners Bill of Rights, Dodd-Frank Act and the Consumer

Financial Protection Bureau's "New Servicing Rules" and other California foreclosure

laws.

   Additionally, Plaintiff has tort claims for monetary damages for Plaintiff's

actual costs to bring suit as well as punitive, compensatory and general money

damages in the amount of the accrual of the mortgage debt, as well as other monetary

damages to be shown according to proof or to be proven at jury trial.


### PARTIES

  1.  Plaintiff is an individual and at all time relevant herein is/was a citizen and

resident of the State of California, in the Southern District of California. At all times

relevant herein Plaintiff's principal place of business and residence was/is 1931 Vereda

Court, El Cajon, CA 92010. Hereinafter "Subject Property."

  2.  Defendant BANK OF AMERICA, N.A., (hereinafter "Defendant BOA") is a

publicly traded corporation organized under the laws of Delaware and with it principle

place of business and headquarters in Charlotte, North Carolina, and is a national bank

organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21.

3.    Defendant COUNTRYWIDE HOME LOANS, INC., (hereinafter "Defendant COUNTRYWIDE"). In 2008, Bank of America, N.A. purchased the failing Countrywide Financial for $4.1 billion, with its principal place of business located in Van Nuys, California.

4.    Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR CERTIFICATE HOLDERS OF THE MORGAN STANLEY HOME EQUITY LOAN TRUST 2007-1, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2077-1.(hereinafter "Defendant DBTC") in the business of mortgage-backed securities and operates as a subsidiary of Deutsche Bank Holdings, Inc., with its principal place of business located in Los Angeles, California.

5.    Defendant FIDELITY NATIONAL FINANCIAL, INC., (hereinafter "Defendant FNF") is a publicly traded corporation organized under the laws of Delaware and with its principle place of business headquartered in Jacksonville, Florida. Defendant FNF is the largest provider of title insurance in America, technology and transaction services computer software to the real estate and mortgage industries.

6.    Defendant FNF also provides industry-leading mortgage technology solutions and transaction services software known as "Fidelity MSP", the leading residential mortgage servicing technology software platform used in loan servicing in the U.S., as well as a software platform commonly known as "FORTRAC" the same

system used to unlawfully charge erroneous fees to Plaintiff account which were not disclosed in the Truth-In-Lending disclosures or any other disclosures to Plaintiff while in escrow or authorized under deed of trust.

7.      Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., (hereinafter "Defendant MERS") is a publicly traded corporation organized under the laws of the State of Virginia. MERS is a separate and distinct corporation that serves as a nominee on mortgages and is owned by a holding company called MERSCORP Holdings, Inc., which owns and operates an ELECTRONIC REGISTRATION SYSTEM known as the *MERS system* designed to track servicing rights and ownership of mortgages in the United States doing business in California with its principle place of business and headquarters in Reston, Virginia.

8.      Defendant SELECT PORTFOLIO SERVICES, INC (hereinafter "Defendant SMS") was/is a California Corporation with its principal place of business located in Van Nuys, California.  Formerly known as Fairbanks Capital Inc.  In November 2003, Fairbanks was fined $40 million by the Department of Housing and Urban Development. The Federal Trade Commission fined Fairbanks for "unfair, deceptive, and illegal practices" in their mortgage loan servicing of sub-prime mortgage loans.".  Now doing business as Select Portfolio Services, Inc.

### Doe Entities 1 Through 10, Inclusive

9.      Whenever reference is made herein to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their

officers, directors, agents, employees or representatives, each of whom was actively

engaged in the management, direction, control or transaction of the ordinary business

and affairs of Defendants and the enterprise.

10.    Plaintiff is informed and believes, and based thereon allege that, at all

material times relevant herein, Defendants , each of them (hereinafter collectively

"Defendants ") was/were the agent, servant, or employee of, and acted within the

purpose, scope, and course of said agency, service, or employment, and with the

express and/or or implied knowledge, permission, and consent of the other defendant,

and ratified and approved the acts of the other defendants.

11.    Plaintiff further is informed and believes, and on that basis, allege

that, at all material times herein, each defendant collectively, was the agent, servant, or

employee of the other defendants, and acted within the purpose, scope, and course of

said agency, service, or employment, and with the express or implied knowledge,

permission, and consent of the other defendants, and ratified and approved the acts of

the other defendants, without limitations.

### FACTUAL ALLEGATIONS AGAINST ALL DEFENDANTS

12.    Plaintiff owns property in San Diego, California (hereinafter "subject

property"). In October of 2006, Plaintiff obtained an interest-only, adjustable-rate

mortgage on the subject property for $735,000.00 from Accredited Home Lender's,

Inc., who has since then dissolved in a Chapter 11 Bankruptcy.

11.    Because of the constant increases in the monthly payment, the loan

became unaffordable. [I]n the Spring of 2008, Plaintiff's mortgage payments jumped

from $5,548.56 to $8,811.92. And the loan amount since then has almost doubled from $735,000.00 to the current amount of the $1,398,000.00 due to late fees, penalties, loan servicing fees and skyrocketing interest rates.

12.     Plaintiff has consistently demonstrated his desire to end the dispute in good faith to receive reinstatement of his mortgage, and has attempted on numerous occasions to negotiate throughout the time in default with Defendant BOA, Countrywide and other "taker-entities" such as BAC Home Lenders, Inc., Recontrust Company, Inc., Home Retention Group, Inc., Quality Home Lenders, Inc., who were all at one point or another --involved then not involved, then involved again, between 2008 and 2015.

13.     Plaintiff' has been the owner of the Subject Property for over thirty-five (35) years, located in City and County of San Diego, Southern District of California. Subject Property is commonly known as 1931 Vereda Court, El Cajon, California 92019. San Diego County Recorder's Parcel ID Number 517-111-52-00. As of May of 2016, the Subject Property was estimated to be worth approximately $740,000.00. Attached hereto as Exhibit "A" is a true and correct copy of the on-line web page identified as TRUILA Estimate reflecting the current market value.

14.     On October 27, 2006, Plaintiff incurred a consumer debt in the amount of $735,000.00 of which was funded by creditor and loan originator Defendants ACCREDITED. Attached hereto as Exhibit "B" is a true and correct copy of the original DEED OF TRUST and NOTE evidencing the debt was recorded on October 28, 2016.

Attached hereto as Exhibit "B" is a true and correct copy of the original Deed of Trust and Note.

15.    On June 14, 2011, the deed of trust was then assigned to DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR CERTIFICATE HOLDERS OF THE MORGAN STANLEY HOME EQUITY LOAN TRUST 2007-1, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2077-1. Attached hereto as Exhibit "C" is a true and correct copy of the original Assignment of Deed of Trust recorded on June 14, 2016.

18.    With regard to Defendant MERS being part robotic artificial intelligence and not a natural person rather The latest court decisions in California occurred on May 20, 2010, in a bankruptcy case identified as: In re Walker, Case no. 10-21656-E–11. The court held that Defendant MERS could not foreclose because it was a mere "nominee", and that as a result, Plaintiff "Citibank" could not collect on its claim. The judge opined:

> "Since no evidence of MERS' ownership of the underlying note has been offered, and other courts have concluded that MERS does not own the underlying notes, this court is convinced that MERS had no interest it could transfer to Citibank. Since MERS did not own the underlying note, it could not transfer the beneficial interest of the Deed of Trust to another. Any attempt to transfer the beneficial interest of a trust deed without ownership of the underlying note is void under California law."

19.    Since the foreclosing parties in Plaintiff's case cannot establish that they are the owner of the promissory note and a holder in due course secured by the trust deed it is in every respect a fraudulent foreclosure. In fact, none of the Defendants named herein are able to assert a claim for payment or foreclose. Accredited Home

VERIFIED COMPLAINT FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF

Lender,s Inc., did not lawfully transfer its authority to foreclose as required by federal and state laws governing all assignments to investment trusts like Defendant DBTC.

20.    The alleged "Assignment" to Defendant DBTC is fraudulent and oppressive in nature and is in direct contravention to recent foreclosure laws and federal statutes.  Defendant MERS is stated to be the NOMINEE only. Defendant MERS electronically titles then robotic-ally assigns mortgages like Plaintiff's deed of Trust and Note to investment trusts like Defendant DBTC. This case exposes the fraudulent abuse of loan servicers like Defendant BOA extracting millions from distressed homeowners by electronically charging erroneous default-related loan servicing fees and other concealed fees and penalties that are all unreasonable, unnecessary, fraudulent and oppressive in nature, and not authorized under the recorded Deed of Trust or Note instruments. This type of corporate financial racketeering being non-human actions and based upon cyber-technology and to a certain degree of artificial intelligence that Defendants, individually or as an industry could not be held liable for what could be claimed as a "computer glitch" to wiggle their way out of palpable liability. However, Plaintiff certainly can have Defendants named herein held accountable to Plaintiff and this court of law

21.    Because the fact that the MSP software program used [is] the actual instrument used by Defendant BOA  facilitated the fraudulent fees and charges accessed. Plaintiff alleges that Defendant FNF are the provider of a program that systematically defrauds homeowners by providing a software program that makes it

possible for loan servicer's like the Defendants named in this lawsuit and others to charge hidden fees, penalty and loan service fee's unabated, unrestrained, and operate without accountability and with impunity. Defendant FNF has an enhanced fiduciary duty as the holder of the title insurance policy on Plaintiff's residence, as they are also liable to Plaintiff for the injuries sustained by Plaintiff as a direct result of the use of Fidelity MSP software platform.

22.    This action is taken as a result of the fraudulent and misleading practices committed by the Defendants BOA and FNF in correlation to their home mortgage loan servicing businesses. Defendants BOA service almost 20 million loans throughout the United States, controlling 25% of the entire loan servicing Industry.

23.    By means of an automated mortgage loan servicing management system and and enterprise of "taker-entities" or subsidiaries and elaborate inter-company departments and divisions, Defendants BOA have engaged in a scheme to fraudulently conceal their unlawful assessment of improperly marked-up or unnecessary fees for default-related services, cheating borrowers already in distress like Plaintiff who can least afford it. When Plaintiff got behind on his payments and went into default, Defendants conducted various default-related services on Plaintiff's account, purportedly designed to protect the original lender's and/or investor's interest in the property. However, neither original lender's and/or investor's are permitted to mark-up the fees for such services to earn a profit. Nor are Defendants permitted to assess Plaintiff's account for default-related service fees that are unreasonable and

unnecessary as they have done with impunity to twenty million distressed homeowners.

24.    More specifically, Defendants BOA, under false pretenses materially concealed the truth from Plaintiff --and that is precisely what Defendants did to, in effect, generate for themselves huge profits from unlawfully accessing default-related service fees to distressed homeowners like Plaintiff. Defendants BOA have merely substituted inflated interest rates with inflated default-related service fees.

25.    Defendants BOA formed various enterprises such as BAC Home Lenders, Inc., Recontrust Company, Inc., Home Retention Group, Inc., Quality Home Lender, Inc.,[associations of subsidiaries and affiliated companies] were designed to disguise through conversion the hidden marked-up fees, and superfluous fees so that they could earn even more undisclosed profits. Through these unlawful enterprises, Defendants BOA mark-up the fees charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts like Plaintiff's account for the hidden fees and penalties for huge profits.

26     In connection with their fraudulent schemes, Defendants BOA have a practice of routinely assessing fees for default-related services, even when they are entirely unnecessary and clearly inappropriate. By deploying this tactic, Defendants BOA are able to quietly and clandestinely earn huge profits from default-related service fees --at the expense of distressed homeowners like Plaintiff.

27.     Plaintiff reasonably believed that the lender from whom she obtained her mortgage will hold and service her loan until it is paid off. Instead, through relatively recent mortgage-industry practices, such as securitization and the sale of mortgage-backed securities, that is often not the case. In today's market, loans and the rights to service them are bought and sold at will, multiple times over in a single year.

28.     Because banks like Defendants BOA who service loans do not profit directly from interest payments made by borrowers, rather than ensuring that borrowers stay current on their loans, Defendants BOA are more concerned with generating revenue from fees assessed against the mortgage accounts they service. Borrowers like Plaintiff are captives to companies like Defendants who service his mortgage loan.

29.     Accordingly, when borrowers go into default and Defendants BOA unilaterally decide to perform default-related services, borrowers have no option but to accept Defendants' choice of providers. Taking advantage of these circumstances, Defendants formed enterprises with their respective subsidiaries and affiliates, and then, developed a uniform practice of unlawfully marking up default-related service fees.. Banks like Defendants BOA saw opportunity where investors saw failure because charges assessed against borrowers' accounts so that Defendants BOA alone could earn undisclosed profits in connection with loan servicing. Defendants BOA marked-up fees violate Plaintiff's mortgage agreement because the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage agreement requires, "reasonable" or "appropriate" to protect the note holder's and/or investor's interest in the property.

marked-up fees violate Plaintiff's mortgage agreement because the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage agreement requires, "reasonable" or "appropriate" to protect the note holder's and/or investor's interest in the property.

30.     Defendants BOA are aware that it is improper to mark-up the fees assessed on borrowers' accounts for default-related services, as they did on Plaintiff's account . Therefore, Defendants fraudulently concealed these fees on Plaintiff's account, omitting any information about Defendants' additional profits, by identifying them on mortgage statements only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances."The rampant abuses by mortgage servicers like Defendants BOA, has led federal regulators to enter into numerous Consent Orders, but according to Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation, "these consent orders do not fully identify and remedy past errors in mortgage-servicing operations of large institutions; in fact, the scope of the inter-agency review did not include a review of ... the fees charged in the servicing process. Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward. Plaintiff brings this action seeking injunctive relief and damages who has been victimized by the Defendants' uniform schemes. America's lending industry is in disorder and chaos. Many of the current problems in the industry derive from the fact that the lending community has divorced itself from the borrowers it once served. Traditionally, when people wanted to borrow money, they went to a bank or a "savings and loan." Banks loaned money and borrowers promised to repay the bank,

with interest, over a specific period of time. The originating bank kept the loan on its balance sheet, and serviced the loan, processing payments, and sending out applicable notices and other information, until the loan was repaid. The originating bank had a financial interest in ensuring that the borrower was able to repay the loan. Today, however, the entire process has changed significantly. Mortgages are now packaged, bundled, and sold to investors on Wall Street through what is referred to in the financial industry as mortgage backed securities or MES.  Defendants BOA now enjoy the financial benefits of immediately being able to recover the amounts loaned by way of default-related service fees.

31.       Numerous unexpected consequences have resulted from the divorce between lenders and borrowers that should have been disclosed in the TILA notice signed in escrow. Including, but not limited to, securitization has created an industry of companies in the lending servicing industry like Defendants DBTC, who no longer make money primarily from interest on the loans they scrutinized. Defendant BOA, DBTC and SPS no longer have a  financial interest in the repayment of loans or modification or reinstatement of the mortgage that they once did. Instead, banks like Defendants BOA service mortgages for hedge funds and investment houses who own the loans and no interest in anything but foreclosure to realize a profit.

32.       Rather than earning income from the interest on these loans, banks like Defendant BOA have chosen to make even more profits by accessing default-related loan servicing fees on top of milking the government and title insurance for profits. Defendant BOA are paying themselves for their loan servicing in a manner that clearly should have been disclosed at escrow signing . Additionally, under agreements with

trust investors (pooling and service agreements), loan servicers like Defendants BOA believes they are entitled to assess fees on borrowers' accounts like Plaintiff's account for default-related services in connection with their servicing of Plaintiff's loan. These fees for example include Broker's Price Opinion fees, and appraisal fees. Defendants' collection of these fees, however, exemplifies how America's lending industry has run off the rails charging default-related service fees while is receiving unwarranted government proceeds at tax payers.

33.    As the Board of Governors of the Federal Reserve System has admittedly stated, "[ w ]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicers are tied to it only indirectly, at best. The servicers makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. ... The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse. " For banks like Defendants BOA, and all of it's "taker-entity" subsidiaries designed and formed to operate in a mechanized manner foreclosing as just a disclosed natural cycle of mortgage debts they concealed from Plaintiff when securing the subject mortgage debt.

Defendants BOA actually believe they have a legal right to charge exorbitant fees for loan servicing that is nothing short of blatant exploitation. As a result of the disassociation between loan servicers and the monies generated from the interest borrowers pay on their loans, Defendant BOA have been incentivized to find other ways to grow their profits. Defendants FNF automated loan servicing practices that

make it possible for Defendant BOA to access these unlawful charges with impunity. Defendant BOA services approximately 20 million loans throughout the United States. To maximize profits, Defendants BOA assign the complex task of administering these millions of loans to computer software products made by Defendant FNF. Defendants working together automated their loan servicing businesses a way to realize huge profits through a computer software program designed and provided by Defendant FNF. The program is known as a mortgage servicing package called Fidelity MSP or FORTRACS. Fidelity MSP or FORTRAC is a sophisticated home loan management software program co-designed and used by Defendant BOA on Plaintiff's mortgage account, and is one of the most widely used loan servicing software PLATFORM in the United States. When Plaintiff's loan was originated, guidelines for managing her loan was imported into Fidelity MSP, along with 20 million other loans serviced by Defendants. Plaintiff's loan was then automatically managed by the Fidelity MSP software program according to Defendant BOA's dilatory guidelines. For example, inter alia, if a loan [Plaintiff's] in Defendants' systems is past due, the guidelines instruct the computer when to impose late fees. Defendants also assess other charges and fees against borrowers' accounts by using *"wrap around" software packages* that work with the Fidelity MSP System. It is this system that was used by Defendants on Plaintiff's account. Based on parameters inputted into these programs, Defendants' BOA computer systems automatically implement decisions about how to manage borrowers' accounts, including Plaintiff's account, based on internal software logic. The program was designed to manage the modification application process and places accounts in-default like Plaintiff's' account and assess fees, according to a protocol designed by the

executives at Defendant BOA and The Fidelity MSP software. To manage loans in default, they also use a software program called "FORTRACS." FORTRACS automates default management processing, decisioning and documentation of a loan. With fully integrated modules and synchronization of activities, it supports the lender's credit and collateral risk management through loss mitigation, foreclosure processing.

34.     Plaintiff is informed and believes, and based thereon, allege that as part of the Defendants enterprises' efforts to conceal the extent of their activities, Defendants also program their computer systems to automatically remove from account statements submitted in court proceedings, some of the fees and charges typically assessed against borrowers accounts because they have been prohibited by a particular jurisdiction or judge within a jurisdiction. In their loan servicing operations, Defendants follow a strategy to generate fraudulently concealed default-related fee income. Rather than simply obtain default-related services directly from independent third-party vendors, and charge borrowers for the actual cost of these services, then Defendant BOA assess borrowers' accounts for services that are unnecessary and they unlawfully add additional, undisclosed profits on to the charges before they are assessed on borrowers' accounts.

35.     Defendants' scheme works as follows. Defendants order default-related services from their subsidiaries and affiliated companies, who, in turn, obtains the services from third-party vendors. The third-party vendors charge Defendants for their services. Defendants, in turn, charge borrowers a fee that is significantly marked-up from the third-party vendors' actual fees for the services. As a result, even though the mortgage market has collapsed, and more and more borrowers are falling into

delinquency, Defendants continue to earn substantial profits by assessing undisclosed, marked-up fees for default-related services on borrowers' accounts. The mortgage contract between a lender and a borrower consists of two documents: the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument"). The mortgage contacts serviced by Defendants are substantially similar because they conform to the standard FannieMae/Freddie Mac form contract. These contracts contain form language regarding what occurs if borrowers default on their loans. The Security Instrument authorizes the loan services', in the event of default, to: pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

36.   The Security Instrument further provides that any such amounts disbursed by the loan servicer and shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement. The Note provides that the note holder: will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees. Thus, the mortgage contract allows the loan servicer to pay for default-related services when necessary or appropriate, and to be reimbursed by the borrower, but it does not authorize the loan servicer' to mark -up the actual cost of those services to make a profit. Broker's Price Opinions ("BPOs") are a significant category of default- related service fees that, in furtherance of Defendants' unlawful

enterprises, are assessed on borrowers' accounts with substantial, undisclosed mark-ups, fraudulently generating revenue in the loan servicing business.

37.     As discussed above, by charging marked-up fees for BPOs, Defendants BOA violate the agreements with borrowers because, among other things, charges that exceed the actual cost of the services provided are neither reasonable, nor appropriate to protect the note holder's interest in the property and the rights under the security instrument.

38.     Furthermore, the wrongful nature of the marked-up fees is demonstrated by the fact that Defendants do not disclose to borrowers that the fees assessed on their accounts are marked-up borrowers' accounts in amounts ranging from $95 to $135, under Fannie Mae guidelines, the maximum reimbursable rate for an exterior BPO is $80,70 and in practice, the actual cost is much less. According to the National Association of BPO Professionals, the actual cost of a BPO may be as little as $30.00.

## Practices Specific to the FNF/BOA/SPS Enterprise

### (Defendant BOA and its subsidiaries)

39.     Defendant BOA, and its subsidiaries, BAC Home Lender, Inc., Home Retention Group, Inc., and Quality Home Lender, Inc., Doe entities 1 through 10, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses. According to Defendants BOA  2010 Annual Report, "[w]hen it becomes likely that a borrower is either unable or unwilling to pay, the firm obtains a broker's price opinion of the home based on an exterior only valuation ".

40.    . Plaintiff is informed and believes, and on that basis, alleges that using its computerized automated mortgage loan management system and an enterprise of Defendant BOA's subsidiaries and inter-company departments and divisions, Defendant BOA unlawfully charges marked-up fees for default-related services. Furthermore, to fraudulently conceal its actions and mislead borrowers like Plaintiff about the true nature of its actions, Defendant BOA employs a corporate practice that omits true nature of the fees that are being assessed on borrowers' accounts like Plaintiffs account.

41.    Plaintiff is informed and believes, and on that basis, alleges that Defendant BOA conceals these marked-up fees for default-related services on borrowers accounts, by identifying the charges only as "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" on borrowers' statements. Defendant BOA also assesses unnecessary and unreasonable fees for property inspections. In order to generate profits from these fees, Defendant BOA's automated loan servicing system is set up to order property inspections and assess fees against borrowers when they are a certain number of days late on their mortgage, regardless of whether the assessment of such fees is appropriate, reasonable, or necessary under the circumstances.

42.    Although such inspections purportedly are conducted to guard against property loss, Defendant BOA's practices are designed to ensure that these fees are charged to as many accounts as possible, even if the inspections are inappropriate, unnecessary, or unreasonable.

43.     Plaintiff is informed and believes, and on that basis, alleges that guidelines inputted into Defendant BOA's loan management software system automatically trigger property inspections if a loan is past due by a certain number of days. After a borrower's account is past due by a set number of days, as inputted into the software, Defendant BOA's computer automatically generates a work order for a property inspection automatically, *and without human intervention.* Moreover, so long as a borrower's account is past due by the requisite number of days inputted into the loan management software, Defendant BOA's system automatically continues to order inspections, regardless of whether it is reasonable or appropriate under the circumstances. Plaintiff is informed and believes, and on that basis, alleges that even if the property inspections were properly performed and actually reviewed by someone at the bank, Defendant BOA continuous assessment of fees for these inspections on borrowers accounts is still improper and unreasonable because of the frequency with which they are performed. If the first inspection report shows that the property is occupied and in good condition, it is unnecessary and inappropriate for Defendant BOA's system to automatically continue to order monthly inspections. Nothing in the reports justifies continued monitoring. In order to further lull borrowers into a sense of trust, conceal Defendant BOA's unlawful fees, and dissuade borrowers from challenging Defendant BOA s unlawful fee assessments, Defendant BOA falsely represents on statements provided to borrowers that "Other Fees" and "Advances," which are charges for BPOs and property inspections, include "amounts allowed by [borrowers'] Note and Security instrument.

**Plaintiff's Injuries From Defendants' Unlawful Business Practices**

44.     In addition to the direct monetary damages caused to Plaintiff, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on Plaintiff' account, Plaintiff suffer other, less obvious injuries as a result of the practices described. After paying delinquent principal and interest, there is not enough to cover the entire monthly payment. This makes that payment late, creating a cascade of more fees, and more arrears, that keeps Plaintiff in delinquency.

45.     By the time Plaintiff was aware, Defendants Defendant BOA were threatening to foreclose unless a huge payment was made, and the weight of these unnecessary fees drops Plaintiff into a financial abyss.

46.     As a result of Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score. Defendants Defendant BOA provide information about borrowers' payment history to credit reporting companies, including whether they have been late with a payment or missed any payments. By keeping borrowers in default with these practices, Defendants affect whether borrowers can get a loan in the future - and what borrowers' interest rate will be on such loans.

47.     The assessment of these marked-up fees can make it impossible for Plaintiff to become current on his loan. Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving Plaintiff further into default. When Plaintiff got behind on his mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments,

Defendants practices make it increasingly difficult for Plaintiff to ever bring his loan current. Even if Plaintiff was to pay the delinquent principal and interest payments, the marked-up fees for default-related services ensure that Plaintiff stays in default.

48.     As  a result of the unlawful business practices above-described, Defendants BOA and FNF are both responsible and should be held accountable for creating and using a program that its only purpose is to unjustly enrich bank's like Defendant BOA and its subsidiaries –Not only because they jointly developed he software program "Fidelity MSP" or "FORTRAC" but also because Defendant FNF knew or should have known, that it would lead to fleecing homeowners already in financial despair.  Defendants BOA and FNF  created the platform for theft for Defendants BOA's Loan Servicing Agents Defendant SPS to literally and deliberately deceive Plaintiff every step of the way.

49.     In the interest of justice Defendant FNF should be held to the rule of law. The fact of the matter [is] that Defendant FNF holds every title insurance policy in America and/or every title insurance policy is underwritten by Defendant FNF –this fact should not be overlooked as incidental. The pervasive nature of Defendant FNF's "all-access" to unsuspecting homeowners should set off alarms to the glaring conflict of interest.

50.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiff was kept ignorant of critical information required for the prosecution of their

claims, without any fault or lack of diligence on his part. Plaintiff could not reasonably have discovered the true nature of the Defendants' marked-up fees scheme.

51.     Defendants are/were under a continuous duty to fully disclose to Plaintiff pursuant to TILA, RESPA, HBOR and HOEPA the true character, quality, and nature of the fees they assess on Plaintiffs account Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of marked-up fees against Plaintiff's account. Plaintiff reasonably relied upon Defendants' knowing, affirmative, and active concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

52.     As a result of Defendant BOA's fraudulent concealment of material facts, Plaintiff was prevented from doing anything but send them his Qualified Written Request ("QWR") which went unanswered. Plaintiff did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful fees assessed against her account. Legal scholars have explained that, as a result of these deceptive practices, it [is] impossible for borrowers to determine that they are victims of these violations, because without a true itemization that identifies the nature of each fee, parties cannot verify that a mortgage claim is correctly calculated ".

53.     Plaintiff alleges the Defendant BOA and Defendant SPS as the Loan Service Agent were overreaching and charging Plaintiff fees that are not permitted by law or by the terms of the contract.

54.     By obscuring the information needed to determine the alleged basis for the charges, servicers thwart effective review of mortgage claims. The system only functions as intended if complete and appropriate disclosures are made. [T]his was the true intent of the Truth-in-Lending Act.

## California's Homeowner Bill of Rights & Nonjudicial Foreclosure Laws

55.     In July 2012, California Governor Jerry Brown signed the Homeowner Bill of Rights (HBOR). This landmark legislation was created to combat the foreclosure crisis and hold banks accountable for exacerbating it. HBOR became effective on January 1, 2013, on the heels of the National Mortgage Settlement. The U.S. Department of Justice, HUD, and state attorneys general filed claims against Defendant BOA for deceptive and wrongful foreclosure practices. *See* Complaint at 21-39, United States v. Bank of Am., No. 1:12-cv-00361-RMC (D.D.C.).

## Defendant SPS Violated "Pre-NOD Outreach" Requirements

56.     HBOR continued the existing requirement that a loan servicer may not record a notice of default (NOD) until 30 days after contacting,or diligently attempting to contact, the borrower to discuss alternatives to foreclosure. Defendant SPS failed to do either. Defendant did not even attempt to contact Plaintiff.

57.     Instead, Plaintiff was sent letters which Plaintiff followed up and calling Defendant SPS about their correspondence and was told on numerous occasions mislead with false information that was clearly contradictory to the correspondence received. Because the statute requires the loan servicer to initiate specific contact,

Plaintiff's borrower-initiated loan modification inquiries, or general contact, <u>does not</u> satisfy the pre-NOD contact requirements of HBOR.

58.     HBOR's pre-NOD outreach requirements expand upon existing communication requirements. For example, the former Civil Code Section 2923.5 only applied to deeds of trust originated between 2003 and 2007. HBOR removed this time limitation. Plaintiff brings his claims under the pre-HBOR law.  HBOR requires a number of additional outreach requirements.  Defendant SPS met not even one of these requirements with Plaintiff. These servicers must alert borrowers that they may request documentation demonstrating the servicer's authority to foreclose. Defendant SPS failed again to do so with Plaintiff.  They are also required to provide *post*-NOD outreach if the borrower has not yet exhausted the loan modification process. In Plaintiff's case, after the NOD was posted, Defendant SPS continued to Dual-Track Plaintiff and continued deceiving Plaintiff with misinformation. The conduct of Defendant SPS does violence to the HBOR statute.

### "Single Point of Contact" Violations

59.     Defendant BOA and SPS was required to provide Plaintiff with a single point of contact, or "SPOC." Specifically, "upon request from a borrower who requests a foreclosure prevention alternative, the . . . servicer shall promptly establish a [SPOC]"39 and provide borrower with a "direct means of communication" with that SPOC. In Plaintiff's case, Defendant SPS made his SPOC unreachable or others stated that there was "nothing to communicate" and/or messages went unanswered altogether.

**"Dual-Tracking" Violations**

60.     In addition to perform the mandated outreach and communication required by law, the Defendants engaged in dual tracking Plaintiff by evaluating Plaintiff for a modification while simultaneously proceeding with a foreclosure upon Plaintiff. Plaintiff submitted a complete loan modification application on three separate occasions, to no avail.

61.     The amount and terms of the trial modification plan offered to Plaintiff did not comport to the amount and terms stated in writing. And on more than one occasion Defendant SMS sent via facsimile significantly higher every time provided in writing. HBOR prohibits the servicer from "recording" an NOD or NTS, or "conducting" a foreclosure sale.  In Plaintiff's case, Defendant SPS violated and did all of the above. A contemporary illustration of Defendant SPS's dual-tracking Plaintiff with reckless disregard for HBOR legislative rules

62.     Dual tracking protections require Defendant SPS to postpone or cancel an impending sale, regardless of the exact statutory language. *See* Singh v. Wells Fargo Bank, N.A., No. 34-2013-00151461. There is no departures in case law relevant to this issue.

63.     Regardless of whether Defendant BOA instructs Defendant SPS or Quality Home Servicing Corporation (subsidiary of BOA) to cancel the Trustee Sale scheduled for May 12, 2016, or [if ] postponing a sale . It is nonetheless considered "conducting" a sale. Plaintiff seeks injunctive relief based on dual tracking claims as [it] is still possible when a scheduled sale has been postponed. Plaintiff has Dual-Tracking protections under HBOR that Defendant SPS have violated with impunity.

64.   Defendants BOA and SMS may not avoid HBOR liability in this case. Even more libelous for Defendants BOA and SMS in denying Plaintiffs application for modification five (5) days before the scheduled Trustee Sale.  Defendants BOA and SPS did not wait for the appeal period to pass (or process Plaintiff's appeal) before proceeding with foreclosure in this case. In patent violation of HBOR.

65.   Defendant SPS offered loan modification, however, did not inform Plaintiff by letter until weeks after the date indicated on the letter.  Defendant SPS failed to provide meaningful notice that they were offering modification until after the 14 days had expired. Defendants SPS gave no time for Plaintiff to reject or accept the offer, before Defendant SPS proceeded anyways with foreclosure. Plaintiff's application was denied without providing Plaintiff a chance to accept or reject the offer., or explain Plaintiff's appeal rights or give a specific reason for the investor-based denial or description of the foreclosure alternatives still available to Plaintiff. Plaintiff was denied due process of law with regard to the modification process altogether.

66.   Further, Defendant SPS could not lawfully proceed with the foreclosure until thirty-one (31) days after denying Plaintiff's application, in writing, or 15 days after denying Plaintiff's appeal.  Defendant SPS is prohibited from charging borrowers late fees during either the application or appeal processes.  HBOR creates a procedural framework for requiring a decision on pending loan modification applications before initiating or proceeding with a foreclosure.  Defendant SPS falsely claims that documents were not received, Defendant SPS's assertion that an application was incomplete is false and misleading, and a feral attempt to escape dual tracking liability.

67. Pursuant to HBOR, a loan servicer may not record an NOD as long as the borrower remains compliant with an approved loss mitigation plan. If a plan is approved after an NOD is recorded, a servicer may not proceed with the foreclosure process as long as the borrower is plan-compliant. The servicer must also rescind the NOD and cancel a pending sale.

### The Dodd-Frank Act & Consumer Financial Protection Bureau's (CFPB) New "Servicing Rules"

68. The Dodd-Frank Act and CFPB amended the existing federal framework provided by the Real Estate Settlement and Procedures Act (RESPA) and the Truth in Lending Act (TILA), and became effective January 10, 2014.

69. Plaintiff alleges RESPA violations against all Defendants, each of them, for the conduct occurring after January 10, 2014, but related to Plaintiff's completed modification application submitted *before* January 10, 2014. Plaintiff brings RESPA claims under the new rules (for servicer conduct occurring after January 10, 2014), and claims under HBOR for Injunctive Relief.

70. Plaintiff has endured a never ending cycle of frustration and confusion concerning the servicing practices of Defendant SPS, furthermore, have failed to appropriately and timely apply payments, assessed unwarranted fees, failed to timely respond to loan modification requests, and wrongfully denied a loan modification requests. Plaintiff has been tossed from one representative to another every time he was seeking information concerning the status of loss mitigation. Given the foregoing and the lack of good faith effort on Defendant SPS's part to assist Plaintiff, instead operating in a manner that is contrary to mandates issued by regulatory agencies and this court for prudent and fair servicing practices.

## Assignments of the Deed of Trust

71.     Only the holder of the beneficial interest may substitute a new

trustee, assign the loan, or take action in the foreclosure process.  A beneficiary's

assignee must obtain an assignment of the deed of trust before moving forward with

the foreclosure process. While foreclosing entities have always required the authority to

foreclose, HBOR codified this requirement in Civil Code Section 2924(a)(6).114 Both

before and after HBOR, courts have allowed wrongful foreclosure claims. Plaintiff

hereby asserts standing and alleges that the lender is not the current beneficiary under

the deed of trust.

## FIRST CAUSE OF ACTION
## FRAUDULENT FORECLOSURE
## [Against All Defendants]

72.     Plaintiff incorporates herein by reference the allegations made in

paragraphs 1 through 71, inclusive, as though fully set forth herein.

73.     Defendants SPS employees regularly lied to Plaintiff in his

endeavor seeking loan modification, denied Plaintiff's applications for made up

reasons, and Defendant BOA's loan servicing agents defendant SPS were rewarded

for sending homeowners into foreclosures. This fact has been established by sworn

statements by former Defendant BOA employees under penalty of perjury.

74.     In another recent case against BOA Five of Defendant BOA's

employees stated that they were encouraged to mislead customers. "We were told to

lie to customers and claim that Bank of America had not received documents it had

requested," said Simone Gordon, who worked for Defendant BOA from 2007 until early

2012 as a senior collector. "We were told that admitting that the Bank received

documents 'would open a can of worms,'" she said, since the bank was required to underwrite applications within 30 days of receiving documents and didn't have adequate staff. Wilson said each underwriter commonly had 400 outstanding applications awaiting review.  Anxious homeowners like Plaintiff calling in for an update on their application were frequently told that their applications were "under review" when, in fact, nothing had been done in months, or the application had already been denied.

75.     Defendant BOA employees were rewarded for denying applications and referring customers to foreclosure. In fact, Defendant BOA collectors "who placed ten or more accounts into foreclosure in a given month received a $500 bonus." Other rewards included gift cards to retail stores or restaurants.

76.     Plaintiff is informed and believes and thereon alleges that after the origination and funding of Plaintiff's Loan, it was sold or transferred to trust investors Defendant DBTC who did not own the loan or the corresponding note at any time during default. Moreover, Defendant SPS was not lawfully appointed as trustee by Defendant DBTC and DOES 1 through 10. Accordingly, none of the Defendants named herein in this action had the right to declare default, cause notices of default to be issued or recorded, or foreclose on Plaintiff's interest in the Subject Property. None of the Defendants in this action was the note holder or a beneficiary of Plaintiff's Loan at the time of foreclosure.

77.     Plaintiff further alleges on information and belief that none of the Defendants in this action were beneficiaries or representatives of the beneficiary. That is, none of them were assigned the Note by Deed of Trust executed by Plaintiff. All documents upon which the NOD was based were invalid and void as well.

78.     Defendants BOA,DBTC and SPS further breached the provisions of Civil Code Section 2924g(c)(1) which requires postponement of a foreclosure sale by "mutual agreement, whether oral or in writing, of any trustor and any beneficiary."

79.     DOES 1 through 10 breached Sections 2924f and 2924g by not providing proper notice of the postponement of the trustee's sale on October 21, 2009, and not providing notice pursuant to the strict requirements of said code sections.

80.     Additionally, Defendants BOA breached the SPA by failing to review the financial information of Plaintiff and negotiate a loan modification with Plaintiff in good faith. Plaintiff is informed and believes that Defendants BOA and DOES 1 through 10 received a substantial amount of TARP funds from the federal government, a condition of which was that Defendant BOA and DOES 1 through 10 was required to comply with the provisions of the SPA. As US Bank, Wells Fargo and DOES 1 through 10 breached their obligations not to foreclose during the review period, the trustee's deed upon sale was issued in violation of the SPA and is void.

81.     Defendants violated California Civil Code §2923.5(a), which requires a "mortgagee, beneficiary or authorized agent" to "contact the borrower or person by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. "Section 2923.5(b) requires a default notice to include a declaration "from the mortgagee, beneficiary, or authorized agent" of compliance with section 2923.5, including attempt "with due diligence to contact the borrower as required by this section." None of the Defendants assessed Plaintiff's financial situation correctly or in good faith prior to filing the Notices of Default against

the Subject Property in this action. Additionally, the declaration was executed on behalf of a corporation that was not in existence at the time of the declaration.

82. Also, the declaration did not satisfy the requirements of Section 2923.5. Accordingly, the

83. Defendants did not fulfill their legal obligation to Plaintiff prior to filing of the Notices of Default and, therefore, any acts based on the Notice of Default taken thereafter were invalid and void.

84. Consequently, Defendants engaged in a fraudulent foreclosure of the Subject Property in that Defendants did not have the legal authority to foreclose on the Subject Property and, alternatively, if they had the legal authority, they failed to comply with Civil Code Sections 2923.5 and 2923.6.

85. As a result of the above-described fraudulent conduct by Defendants, each of them, Plaintiff has suffered general and special damages in an amount according to proof at trial, but not less than $600,000.00.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE RICO ACT
## [Against All Defendants and DOE ENTITIES 1-10]

86. Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 85, inclusive, as though fully set forth herein.

89. Defendants BOA, DBTC and SPS are persons within the meaning of Title 18 United States Code section 1961(3). At all relevant times, in violation of Title 18 United States Code, section 1962(c), Defendants, conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4). The affairs of this enterprise affected interstate commerce through a

pattern of racketeering activity.  Defendants BOA's enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently charging unauthorized and unlawful loan servicing fees onto Plaintiff's account, then concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services.

90.    While Defendants Defendants BOA, participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.

### The Predicate Acts (RICO)

91.    Defendants' systematic scheme to fraudulently conceal assessments of unlawfully marked-up fees on the account of Plaintiff who has his mortgage loan serviced by Defendant SPS, as described above, which was facilitated by the use of the United States Mail and wire, constitutes"racketeering activity" within the meaning of Title IS United States Code section 1961(1) as acts of mail fraud and wire fraud under Title IS United States Code sections 1341 and 1343.

92.    In violation of Title IS United States Code sections 1341 and 1343, Defendant BOA utilized the mail and wire in furtherance of their scheme to defraud Plaintiff whose loan is serviced by Chase by obtaining money from Plaintiff using false or fraudulent pretenses.

93.    Through the mail and wire, Defendant BOA's enterprises provided mortgage invoices, loan statements, or proofs of claims to Plaintiff, demanding that Plaintiff pay fraudulently concealed marked-up and/or unnecessary fees for default related services, such as BPOs. Defendants fraudulently and unlawfully marked-up fees in violation of Plaintiff's mortgage agreements because the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property. Defendants' assessment of fees that were unnecessary are also unlawful because

unnecessary fees are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property. The mortgage invoices, loan statements provided to Plaintiff fraudulently concealed the true nature of assessments made on Plaintiff's account. Using false pretenses, identifying the fees interest in the property. Defendants BOA's assessment of fees that were unnecessary are also unlawful because unnecessary fees are not, as the mortgage agreements require, "reasonable" or "appropriate" to protect the note holder's interest in the property.

94.     The mortgage invoices, loan statements provided to Plaintiff fraudulently concealed the true nature of assessments made on Plaintiff's account. Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances" to obtain full payments from Plaintiff, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups and/or were unnecessary.

95.     Furthermore, to lull Plaintiff into a sense of trust, conceal Defendants' unlawful fees, and dissuade Plaintiff from challenging Defendants BOA's unlawful fee assessments, Defendants BOA further concealed their scheme from Plaintiff by telling him in statements and other documents, that such fees n mortgage invoices, loan statements, or proofs of claims only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances" to obtain full payments from Plaintiff, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups and/or were unnecessary.

96.     Furthermore, to lull Plaintiff into a sense of trust conceal Defendants BOA's unlawful fees, and dissuaded Plaintiff from challenging Defendants BOA's unlawful fee assessments, Defendants BOA further concealed their scheme from Plaintiff by telling him, in instatements and other documents, that such fees are

"allowed by [Plaintiffs'] Note and Security Instrument," or that they are "[i]n accordance with the terms of Plaintiff's mortgage, "

97.     Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to Plaintiff, to pursue and achieve their fraudulent scheme, Defendants BOA engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

**98.**     In an effort to pursue their fraudulent scheme, Defendants BOA knowingly and fraudulently concealed or omitted material information from Plaintiff Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by the fact that they did not disclose the mark-ups and/or unnecessary nature of the fees in their communications to Plaintiff

99.     The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which Defendants BOA have engaged in under Title 18 United States Code section 1962(c). All of the predicate acts of racketeering activity described herein are part of the nexus 18 of the affairs and functions of the Chase racketeering enterprises,

100.     The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

101.     Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

102.     As a direct and proximate result of these violations of Title 18 United States Code sections I 962( c) and (d), Plaintiff has suffered substantial damages. Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

Violation of Title 18 United States Code section 1962(c) (18 U.S.C. § 1962(d).

103.    . Plaintiff incorporates by reference in this cause of action each and every allegations of the preceding paragraphs, with the same force and effect as though fully set forth herein. As set forth above, in violation of Title 18 United States Code section 28 1962(d), Defendants conspired to violate the provisions of Title 18 United States Code section 1962(c).

104.    As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants conspired to violate the provisions of Title 18 United States Code section 1962(c).

105.    As a direct and proximate result, Plaintiff has been injured in their business or property by the predicate acts which make up Defendants BOA' patterns of racketeering activity in that unlawfully marked-up and/or unnecessary fees for default-related services were assessed on their mortgage accounts.

### THIRD CAUSE OF ACTION
### QUIET TITLE
**[Against All Defendants, and All Persons Unknown, Claiming Any Legal Or Equitable Right, Title, Estate, Lien, Or Interest In The Property Described In The Complaint Adverse To Plaintiff's Title Or Any Cloud On Plaintiff's Title Thereto and DOE ENTITIES 1 through 10]**

106.    Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 105, inclusive, as though fully set forth herein.

107.    Plaintiff is the legal owner of the Subject Property.

108.    Plaintiff seeks to quiet title against the claims of US Bank, Wells Fargo, and anyone else claiming interest in the property, and any successors or assignees have no right to title or interest in the property and no right to entertain any rights of ownership including rights of possession.

107.    Plaintiff seeks to quiet title seeks a judicial declaration that the title to the Subject Property is vested in Plaintiff alone and that Defendants, each of them ,be declared to have no interest estate, right, title or interest in the Subject Property and that Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Subject Property.    As Defendants did not have any legal ownership or interest in the Subject Property on the date of foreclosure, allegedly obtained the Subject Property through fraud and unlawful  conduct, and failed to adhere to the strict statutory requirements to effectuate the foreclosure sale of the Subject Property, the foreclosure sale was void and invalid. Therefore, the Subject Property is Plaintiff's property.

108.    Accordingly, the Court should rule that the Subject Property remains Plaintiff's property and award consequential damages as proven at trial, but not less than $600,000,000.

**FOURTH CAUSE OF ACTION**
**SLANDER OF TITLE**
**[Against All Defendants]**

109.    Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 108, inclusive, as though fully set forth herein.

110.    Defendants, each of them, and Doe Entities 1 through 10, purportedly but falsely acting as either the trustee or the agent of the beneficiary of the Deed of Trust, wrongfully and without privilege, caused a Notice of Default, Substitution of Trustee, and Assignment of Deed of Trust to be recorded against the Subject Property. Thereafter, Defendants, each of them, and Doe Entities 1 through 10,  again purportedly but falsely acting as either the trustee or the agent of the beneficiary of the

Deed of Trust, wrongfully and without privilege, caused Notices of Trustee's Sales to be recorded against the Subject Property.

111.     Finally, Defendants, each of them, and Doe Entities 1 through 10, again purportedly but falsely acting as either the trustee or the agent of the beneficiary of the Deed of Trust, wrongfully and without privilege, caused a Trustee's Deed Upon Sale to be recorded against the Subject Property.

112.     None of the Defendants, whether jointly or severally, is a trustee, beneficiary or assignee of any beneficiary of any Deed of Trust recorded against the Subject Property.

113.     Accordingly, they wrongfully caused the recording of the Notice of Default, Assignment of the Deed of Trust, Substitution of Trustee, Notices of Trustee's Sales and Trustee's Deed Upon Sale against the Subject Property.

114.     By doing the acts described above, Defendants slandered Plaintiff's title to the Subject Property.

115.     In that the conduct and acts of Defendants violated, among others, California Civil Code section 2924(a)(1)(C), such conduct and acts were not privileged. The wrongful conduct of Defendants caused Plaintiff to suffer damages in an amount to be proven at trial, but not less than $1,000,000.00.

**FIFTH CAUSE OF ACTION**
**CANCELLATION OF FIVEM RECORDED INTRUMENTS**
**(1) Substitution of Trustee; (2) Notice of Default (3) Assignments**
**of Deed of Trust; (4) Substitution of Trustee; and (5) Notice of Trustee Sale**

116.     Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 115, inclusive, as though fully set forth herein.

117.    If the wrongfully recorded SOT, NOD, Assignment of DOT, First NOTS, Second NOTS instruments are left outstanding, Plaintiff will continue to suffer loss and damages.

118.    Plaintiff therefore seeks cancellation of these recorded instruments.

119.    Plaintiff is informed and believes, and therefore alleges, that Defendants, each of them, and DOES 1 through 10 acted willfully and with a conscious disregard for Plaintiff's rights and with a specific intent to defraud and injure Plaintiff, by causing these instruments to be prepared and recorded without a factual or legal basis for doing so.

120.    Upon information and belief, these acts by Defendants constitute fraud, oppression and malice under Cal. Civil Code §3294. Defendants acted with a conscious disregard for the requirements to conduct a non-judicial foreclosure sale under civil code 2924 et sec. knowing they had taken a calculated risk that Plaintiff would not contest.

121.    By virtue of Defendants, each of them and Doe Entities 1 through 10, willful and fraudulent conduct as herein alleged above, Plaintiff is entitled to general and special damages according to proof at trial, but not less than $600,000,000, as well as tremble, punitive and exemplary damages as determined by this Court.

## SIXTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL
### (Against Defendants BOA, QHL,DBT, SPS and DOE ENTITIES 1 through 10)

122.    Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 121, inclusive, as though fully set forth herein.

123.     Defendants, each of them and Doe Entities 1 through 10 made a promise, through oral and written representations, that they would not foreclosure on the Subject Property if Plaintiff's completed an application for a loan modification and made monthly payments in an amount certain to Defendants SPS. Defendants, each of them and Doe Entities 1 through 10 should have reasonably expected that Plaintiff would rely on such promise;

124.     Plaintiff did in fact justifiably rely on that promise by completing the application and making  payments rather than pursuing alternate measures to avoid the foreclosure sale including, but not limited to, the filing of a Chapter 7 bankruptcy. Additionally, Plaintiff could have explored the possibility of refinancing or marketing and selling the Subject Property, either of which would have been an option as the property was generating income for Plaintiff. Accordingly, Defendants, each of them and Doe Entities 1 through 10 were estopped from taking any action that was contrary to the written and oral promises made by it to Plaintiff.

125.     Additionally, pursuant to the SPA and HAMP, Defendants, each of them and Doe Entities 1 through 10 promised to suspend all pending foreclosure proceedings until he HAMP analysis was complete for all homeowners, including Plaintiff. Plaintiff is a third party beneficiary of this agreement.

126.     Defendants, each of them and Doe Entities 1 through 10 agreement with the federal government of which Plaintiff is a third party beneficiary.

127.     Accordingly, Defendants, each of them and Doe Entities 1 through 10 should be estopped from claiming any benefit from the foreclosure due to its violation of the SPA.

128.     As a result of D Defendants, each of them and Doe Entities 1 through 10's false promises and misrepresentations, Plaintiff suffered special and general damages in an amount according to proof at trial, but not less than $600,000.00.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE
## [[Against All Defendants and DOE ENTITIES 1-10]

129. Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 128 inclusive, as though fully set forth herein.

130.     At all times relevant herein, Defendants, each of them and Doe Entities 1 through 10 acting as Plaintiff's lenders and/or servicers, had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including, but not limited, disclosing to Plaintiff the status of any foreclosure actions taken by it, disclosing who owned Plaintiff's Loan to Plaintiff, refraining from taking any action against Plaintiff that it did not have the legal authority to do, and providing all relevant information regarding the Loan Plaintiff had with them to Plaintiff.

131.     In taking the actions alleged above, and in failing to take the actions as alleged above, Defendants, each of them and Doe Entities 1 through 10 breached their duty of ordinary care and skill to Plaintiff in the servicing of Plaintiff's loans by, among other things, failing to disclose to Plaintiff that it was foreclosing on Plaintiff's Subject

Property while telling him the opposite, treating mortgages as a separate entity to confuse and mislead Plaintiff, preparing and recording false documents, and foreclosing on the Subject Property without having the legal authority and/or proper documentation to do so.

132.    At all times relevant herein, Defendants, each of them and Doe Entities 1 through 10 acting as the alleged trustee under the DOT, but without the legal authority to do so, had a duty to exercise reasonable care and to follow California law with regard to foreclosures, avoid any conflicts of interest in exercising its duties, and refrain from taking any action against Plaintiff that it did not have the legal authority to do.

133.    In taking the actions alleged above, and in failing to take the actions as alleged above, Defendants, each of them and Doe Entities 1 through 10 breached its duty of care and skill to Plaintiff by failing to properly train and supervise its agents and employees with regard to California law regarding the execution and recording of foreclosure documents; executing the SOT, NOD, Assignment of DOT, First NOS, Second NOS and TDUS without the legal authority to do so; failing to follow California law with regard to foreclosures, including, but not limited to, acting as the trustee under the DOT when it did not have the legal authority to do so; and taking actions against Plaintiff that it did not have the legal authority to do.

134.    As a direct and proximate result of the negligence and carelessness of Defendants, each of them and Doe Entities 1 through 10 as set forth above, Plaintiff suffered, and continues to suffer, general and special damages in an amount to be determined at trial, but not less than $6000,000.

## EIEGTH CAUSE OF ACTION
### (Negligent Misrepresentation)
**(Against Defendants  Defendants, each of them and Doe Entities 1 through 10)**

135. Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 134, inclusive, as though fully set forth herein.

136. Defendants, each of them and Doe Entities 1 through 10 made representations to Plaintiff that they would postpone the foreclosure sale of the Subject Property if Plaintiff completed an application for a loan modification and made monthly payments in an amount certain to them.

133.     Defendants, each of them and Doe Entities 1 through 10's representations were not true. Defendants, each of them and Doe Entities 1 through 10.

134.     Defendants, each of them and Doe Entities 1 through 10 had no reasonable grounds for believing the representations were true when they made them.

135.     Defendants, each of them and Doe Entities 1 through 10 intended that Plaintiff rely on the representations.

136.     Plaintiff reasonably and justifiably relied on the representations to his detriment.

137.     As a proximate result of Defendants, each of them and Doe Entities 1 through 10's negligent conduct, Plaintiff has suffered, and will continue to suffer, general and special damages in an amount according to proof at trial, but not less than $600,000.

### NINTH CAUSE OF ACTION
### FRAUD IN THE EXECUTION
**[Against All Defendants and DOE ENTITIES 1 Through 10]**

138.    Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 137, inclusive, as though fully set forth herein.

139. Defendants, each of them and Doe Entities 1 through 10, orally and in Defendants, each of them and Doe Entities 1 through 10 writing, represented to Plaintiff that the Subject Property would not be foreclosed during the time that a loan modification was being reviewed and he made monthly payments. As set forth

above, the oral representations were made by employees of Defendants SPS but represented themselves as being employed by defendants BOA.

139.    Defendants, each of them and Doe Entities 1 through 10 failed to disclose to Plaintiff that they intended to foreclose on the DOT regardless of the agreement. Furthermore, Defendants, each of them and Doe Entities 1 through 10 fraudulently represented that they were separate entities so as to confuse and mislead Plaintiff into believing that Defendant Countywide was the loan servicer when the latter had cease to exist as a corporate entity years earlier.

140.    The representations of Defendants, each of them and Doe Entities 1 through 10 were false and fraudulent as they caused a trustee's sale to be scheduled on May12, 2016, without Plaintiff's knowledge. Although Plaintiff had numerous communications with Defendants, each of them and Doe Entities 1 through 10 prior to May 12, 2016, they never disclosed to Plaintiff that the Subject Property would be sold at a trustee's sale on May 12, 2016.

141.    Defendants, each of them and Doe Entities 1 through 10 intentionally made the representations as part of their pattern and practice to deceive borrowers such as Plaintiff into relying to their detriment so that they could foreclose on homes

before borrowers could seek other remedies or options. The exact same thing happened to Plaintiff. Plaintiff justifiably relied on the oral and written representations of Defendants, each of them and Doe Entities 1 through 10 that no foreclosure would take place during the loan modification process and did not seek other remedies or pursue other options during the process. As a proximate result of Defendants, each of them and Doe Entities 1 through 10's fraudulent misrepresentations, Plaintiff stands to his home and suffer great emotional distress.

142. Accordingly, as a result of Defendants, each of them and Doe Entities 1 through 10's fraudulent conduct, Plaintiff has suffered, and will continue to suffer, compensatory, general and special damages in an amount to proof, but not less than $600,000.

143. Additionally, Defendants, each of them and Doe Entities 1 through 10 acted with malice, fraud and/or oppression and, thus, Plaintiff is entitled to an award of exemplary and punitive damages.

### TENTH CAUSE OF ACTION
### VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### [Against All Defendants and DOE ENTITIES1 Through 10]

144 Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 143 inclusive, as though fully set forth herein.

142. Plaintiff is a consumer and the obligation between the parties is a debt owed pursuant to the subject notes and trust deeds and is a consumer debt pursuant to the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act").

143. Defendants, each of them and Doe Entities 1 through 10 are either lenders and/or mortgage servicing companies and/or trustees that are in the business of collecting and processing mortgage payments.

144.     The representative of Defendants, each of them and Doe Entities 1 through 10 made false misrepresentations in connection with the debt secured by the DOT on the Subject Property. Specifically, Defendants, each of them and Doe Entities 1 through 10 represented that if Plaintiff submitted an application for a loan modification that they would not foreclose on the Subject Property. This representation was false and fraudulent as the trustee sale has not been postponed or canceled.

145.     As a proximate result of U Defendants, each of them and Doe Entities 1 through 10 's violations of the Rosenthal Act, Plaintiff is entitled to actual and statutory damages, attorney's fees and costs, and such other relief as the court determines is due.

### TENTH CAUSE OF ACTION
### UNFAIR BUSINESS PRACTICES
### (California Business & Professions Code Section 17200, et seq.]
### [Against All Defendants and DOE ENTITIES 1-10]

146.     Plaintiff incorporates herein by reference the allegations made in paragraphs 1 through 145  inclusive, as though fully set forth herein.

147.     California Business & Professions Code Section 17200, et seq., prohibits acts of unfair competition, which means and includes any "fraudulent business act or practice . . ." and conduct which is "likely to deceive" and is "fraudulent" within the meaning of Section 17200.

148.     As more fully described above, Defendants, each of them and Doe Entities 1 through 10 acts and practices are likely to deceive, constituting a fraudulent business act or practice. This conduct is ongoing and continues to this date.

149.     Specifically, as fully set forth above, Defendants engage in deceptive business practices with respect to mortgage loan servicing, assignments of notes and deeds of trust, foreclosure of residential properties and related matters by, among other things,  and the following:

(a) Instituting improper or premature foreclosure proceedings to generate unwarranted fees;

(b) Executing and recording false and misleading documents;

(c) Executing and recording documents without the legal authority to do so;

(d) Failing to disclose the principal for which documents were being executed and recorded in violation of California Civil Code Section 1095;

(e) Failing to record Powers of Attorney in connection with other recorded documents in violation of California Civil Code Section 2933;

(f) Violating the Security First Rule;

(g) Demanding and accepting payments for debts that were non-existent;

(h) Acting as beneficiaries and trustees without the legal authority to do so;

(i) Failing to give proper notice of a trustee's sale and the postponement of the sale pursuant to California Civil Code Sections 2924g and 2924h;

(j) Failing to comply with California Civil Code Section 2923.5;

(k) Failing to comply with the HAMP guidelines;

(l) Misrepresenting the foreclosure status of properties to borrowers; and

(m) Other deceptive business practices.

150.     Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, Defendants have violated several California laws and regulations and said predicate acts are therefore per se violations of California Business and Professions Code section 17200, et seq.

151. Plaintiff alleges that Defendants' misconduct, as alleged herein, gave, and have  given, Defendants an unfair competitive advantage over their competitors. The scheme implemented by Defendants is designed to defraud California consumers and enrich the Defendants.

152.     The foregoing acts and practices have caused substantial harm to California consumers.

153.     Plaintiff alleges that as direct and proximate result of the aforementioned acts, Defendants have prospered and benefitted from Plaintiff by collecting mortgage payments and fees for foreclosure related services, and have been unjustly enriched from their act of foreclosing on Plaintiff's home when they had agreed not to do so and/or to do so in compliance with applicable laws.

154.     By reason of the foregoing, Defendants have been unjustly enriched and should be required to disgorge their illicit profits and/or make restitution to Plaintiff and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to California Business & Professions Code Sections 17203 and 17204. Moreover, as a result of the aforementioned acts and conduct, Plaintiff has lost money and property and suffered injury in fact, and other members of the public falling victim to Defendants' schemes are likely to be injured.

155.     The harm to Plaintiff and to members of the general public outweighs the utility of Defendants' policy and practices. Consequently, their policy and practices constitute an unlawful business act or practice within the meaning of Business and Professions Code §17200.

Further, the foregoing conduct threatens an incipient violation of a consumer law, or violates the policy or spirit of such law or otherwise significantly threatens or harms competition.

156.     Defendants' practices described above are likely to mislead the general public, and therefore, constitute a fraudulent business act of practice within the meaning of Business and Professions Code §17200. The Defendants' unfair, unlawful, and fraudulent business practices and false and misleading advertising present a continuing threat to members of public in that other consumers will be defrauded into having their property improperly sold at foreclosure. Plaintiff and other members of the general public have no other adequate remedy of law.

157.     Plaintiff is therefore entitled to injunctive relief and attorney's fees as available under California Business and Professions Code Sec. 17200 and related sections. These acts and practices, as described in the previous paragraphs, are unfair and violate Busness and Professions Code § 17200 because their policies and practices described above violate all the statutes previously listed as well as California Civil Code § 1709, and consequently, constitute and unlawful business act of practice within the meaning of Business and Professions Code §17200.

/./

/./

## ELEVETH CAUSE OF ACTIO8iN
## DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF
### [Against All Defendants and DOE ENTITIES 1-10]

158.     Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 131, inclusive, as though fully set forth herein.

159.     Defendants, each of them and Doe Entities 1 through 10 have taken actions in violation oft heir statutory, legal and contractual duties. Said actions have resulted in the wrongful foreclosure of the Subject Property. An actual dispute exists between Plaintiff and Defendants, each of them and Doe Entities 1 through 10 as to the ownership of the Subject Property, and the validity, if any, and amount, if any, of the liens that were on the Subject Property prior to foreclosure.

160.     Due to the dispute as to the rights and interests of the parties to the Subject Property, Plaintiff requests that the Court declare the rights of the parties in this matter. Plaintiff requests that the Court enforce these rights with the issuance of injunctions or restraining orders as may be necessary to place the parties in their proper position with respect to their interests, if any, in the Subject Property.


## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against the Defendants and each of them, jointly and severally, as follows:

1. For a declaration of the rights and duties of the parties, specifically that the attempted foreclosure of the Subject Property was fraudulent.

2. For a declaration that Plaintiff is the true and rightful owner of the Subject

Property.

3. For issuance of an Order canceling the SOT, NOD, Assignment of DOT, First

NOS, Second NOT,

4.  For Judgment in favor of Plaintiff for Violation of RICO 18 US Section 1962(c)

5.   For quiet title in favor of Plaintiff and against  Defendants, each of them and

Doe Entities 1 through 10.

6.     For compensatory, special and general damages in an amount according

to proof at trial, but not less than $600,000,00 against all Defendants.

7. For punitive damages in an amount to be determined by the Court against

all Defendants.

8.. Pursuant to Business and Professions Code § 17203, that all Defendants,

their successors, agents, representatives, employees, and all persons who act in

concert with them be permanently enjoined from committing any acts of unfair

competition in violation of § 17200, including, but not limited to, the violations alleged

herein.

9. For civil penalties pursuant to statute, restitution, injunctive relief and

reasonable attorney's fees according to proof.

10. For reasonable attorney's fees and costs.

11. For reasonable costs of suit and such other and further relief as the Court

deems proper.                              DATED: May 11, 2016

By: _____
ANDREW EARL KARSH
Plaintiff, In Pro Per

VERIFIED COMPLAINT FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF

1
2
3

## VERIFICATION OF COMPLAINT

4

I, ANDREW E. KARSH, am the plaintiff in the above-entitled action. I have read

5

the foregoing complaint and know the contents thereof. The same is true of my own

6

knowledge, except as to those matters which are therein alleged on information and

7

8

belief, and as to those matters, I believe them to be true.

9

I declare under penalty of perjury under the laws of the State of California

10

that the foregoing is true and correct.

11

Executed at El Cajon, California this 11th day of May, 2016

12
13
14
15

By: _____

16

ANDREW EARL KARSH
Plaintiff, In Pro Per

17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9

**JURY DEMAND**

10
Plaintiff demands  jury trial for all causes of action set forth herein.

11
12
DATED: May 11, 2016

13
14
15
By: _____
16
ANDREW EARL KARSH
Plaintiff, In Pro Per

17
18
19
20
21
22
23
24
25
26
27
28